

**IT IS ORDERED as set forth below:**

**Date: May 15, 2018**

_Wendy L. Hagenau_
_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 14-65320-WLH |
| ROCKY RENE WHITE, | CHAPTER 7 |
| Debtor. | |
| JASON L. PETTIE,<br>CHAPTER 7 TRUSTEE FOR THE ESTATE<br>OF ROCKY RENE WHITE, | ADVERSARY PROCEEDING<br>NO. 15-5421-WLH |
| Plaintiff, | |
| v. | |
| KEVIN RINGO AND<br>SHECHEM INDUSTRIES, INC., | |
| Defendants. | |

1

## ORDER

**THIS MATTER** is before the Court on the Complaint by the Trustee alleging the transfer of Debtor's business interest to Kevin Ringo ("Mr. Ringo") was in violation of the Georgia Uniform Fraudulent Transfers Act ("UFTA"),[1] which the Plaintiff asserts pursuant to 11 U.S.C. § 544. The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334, and Plaintiff and Mr. Ringo have admitted this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

The facts in this case have been set out in the Court's prior orders denying Mr. Ringo's Motion for Summary Judgment (Docket No. 89) ("Summary Judgment Order"), granting Shechem's Motions for Summary Judgment (Docket Nos. 66 and 86), and denying Mr. Ringo's Renewed Motion for Summary Judgment (Doc. No. 117). The Court also previously held a trial and issued an order on the complaint to bar Debtor's discharge under section 727 of the Bankruptcy Code in a related adversary proceeding (Case No. 14-5331, Docket No. 204) ("Trial Order").

Debtor Rocky White ("Debtor") filed his voluntary petition under Chapter 7 of the Bankruptcy Code on August 5, 2014. Plaintiff Jason Pettie, as Chapter 7 trustee for the estate of Debtor, filed this adversary proceeding on October 30, 2015 against Shechem Industries, Inc. ("Shechem")[2] and Mr. Ringo. In the Complaint, Plaintiff sought to avoid Debtor's transfer of his interest in certain business entities to Mr. Ringo. Mr. Ringo filed two motions for summary judgment, both of which the Court denied. The Court held a trial on the Complaint as to Mr. Ringo

---

[1] Effective July 1, 2015, the Act's name was changed to the Uniform Voidable Transactions Act. The amendments became effective July 1, 2015 and do not affect this opinion, as they only apply to transfers made or obligations incurred on or after July 1, 2015. *See* Callaway Blue Springs, LLLP v. West Basin Capital, LLC, 801 S.E.2d 325 (Ga. App. 2017).

[2] Plaintiff alleged the transfer of certain real property to Shechem was in violation of the Georgia UFTA, and sought the payment of a two-million-dollar debt allegedly owed to Debtor by Shechem. Shechem filed two motions for partial summary judgment, which were granted [Docket Nos. 66 and 86] and final judgment was issued in Shechem's favor on June 19, 2017 [Docket No. 113].

on February 6-9, 2018, at which the Court heard testimony and received evidence. At the conclusion, the Plaintiff Trustee asked the Court to avoid the transfer of the interest to Mr. Ringo, but the Trustee clarified he was not seeking a monetary judgment.

## I.    FINDINGS OF FACT

Debtor was involved in the development of a technology to treat wastewater, which is referred to by the parties as the NJUN System. In 2001, the limited liability companies NJUN, L.L.C. and NJUN Technologies, L.L.C. ("NJUN Companies") were formed in Georgia for the purpose of developing the NJUN System and bringing it to market. Debtor was an original member of the NJUN Companies with Tom Limbach, Ed Breedlove, Keith Breedlove, and Larry Bradford owning the balance. According to the operating agreement for NJUN, L.L.C. dated February 12, 2002, the Debtor held 37% of NJUN, L.L.C. through his company NJUN Holding, L.L.C. of which he owned 100%. Mr. Limbach, Mr. Bradford, and the Breedloves owned the balance of NJUN, L.L.C. A similar ownership structure was in place for NJUN Technologies.

Around 2003, Mr. Ringo and Guy Abernathy ("Mr. Abernathy"), who were civil engineers and surveyors, and acquaintances of the Debtor and of the other members of the NJUN Companies, agreed to pay business loans of the Debtor to Brand Bank in return for receiving approximately 2.5% interest each in NJUN Holding. In 2005, NJUN Holding agreed to pay $1.5 million to NJUN, L.L.C. over a period of no longer than three years in order to obtain a 51% interest in NJUN, L.L.C. and gain control of NJUN, L.L.C. The percentage membership interests were modified, though, upon NJUN Holding's payment of $350,000 of this sum, together with $150,000 already contributed. Mr. Ringo and Mr. Abernathy contributed all or a portion of the funds paid for the increased interest and obtained a greater interest in NJUN Holding. The balance of $1 million does not appear to have been paid.

3

As part of this transaction, the operating agreement of NJUN, L.L.C. was modified to provide that NJUN Holding, L.L.C. owned 51% of NJUN, L.L.C.  A unanimous written consent of the members of NJUN, L.L.C. provided that the majority of members needed for purposes of voting would mean the majority of percentage interests (as opposed to the majority of separate members) and required that any additional dilution of the members' interests would require the unanimous approval of all members of NJUN, L.L.C.  This unanimous written consent of the members of NJUN, L.L.C. also provided that the member holding the majority of the percentage interest of NJUN, L.L.C. "shall have an exclusive, irrevocable, transferrable license and right to appoint marketing and distribution partners and to sublicense marketing and distribution rights to the company's intellectual property, technology and products, on a territory-by-territory or case-by-case basis."  The unanimous written consent also made clear that the sale or transfer of interests in any subsidiaries would not constitute a dilution of the members of NJUN, L.L.C.  This unanimous written consent was signed by the Debtor as the managing member of NJUN Holding, L.L.C., and also by Keith Breedlove, Ed Breedlove, Thomas Limbach, and Larry Bradford (on behalf of his company, NJUN Development, L.L.C.).  Thereafter, NJUN Holding was the managing member of NJUN, L.L.C., and the Debtor was the managing member of NJUN Holding.

In 2007, the Debtor formed NJUN-NJUN, L.L.C. to hold his membership interest in NJUN Holding, L.L.C., which remained the managing member of NJUN, L.L.C. and a member of NJUN Technologies, L.L.C.  NJUN-NJUN, L.L.C. was not listed on any stock market.  The Debtor retained a 100% interest in NJUN-NJUN.  But, by this time, Mr. Ringo and Mr. Abernathy together held a 44.1% interest in NJUN Holding, while NJUN-NJUN held the remaining 55.9% interest in NJUN Holding.

In 2008 and 2009, the real estate market in Atlanta and around the country declined severely, and the country went into a major recession. This recession impacted the NJUN Companies as it did any other company involved in products used in real estate development. At the time of the recession, no sales of the NJUN System had occurred. By the fall of 2008, NJUN, L.L.C. was in receipt of demands for payment of patent fees. NJUN, L.L.C., through Larry Bradford and others, began to obtain loans from third parties. Several outside parties loaned NJUN, L.L.C. money, including Reid Hailey, Keith Lockhart, and Ed Stamper. The company also owed money for attorney's fees and architecture fees. Altogether, by 2009, NJUN, L.L.C. owed over $1 million on these various items. Additionally, the company did not have funds to buy additional equipment that the Debtor believed was necessary.

In April 2009, the existing members of NJUN, L.L.C. contemplated how best to move forward with the company. The Debtor explored possible sales and other alternatives. During April and May 2009, the Debtor documented his discussions with Mr. Ringo, Mr. Limbach, and Mr. Breedlove in a memo he titled "seeking direction." In it, he explored ways forward with the company, recognizing that some participants were interested in being active while others were interested in a more passive role. Debtor stated that Mr. Ringo expressed his interest in moving forward with the company only in a way that allowed him to be completely in control of all or some portion of the business. This proposal was reiterated in "Oversight Board" minutes in the same time period. Mr. Ringo testified he wanted complete control of the portion of the business in which he was involved.

He first sought to assert some control in July 2009. Mr. Ringo incorporated NJUN One, L.L.C. NJUN Holding, L.L.C., then allegedly assigned to NJUN One, L.L.C. the exclusive rights to manufacture, promote, sell, install, and collect all monitoring and sales fees and conduct all

business-related activities for NJUN Systems for the entire state of Georgia. The Debtor and Mr. Ringo contend that such assignment was consistent with the 2005 amendment to the NJUN, L.L.C. operating agreement.

About the same time, Mr. Ringo began negotiating with Shechem for Shechem's involvement in the NJUN System. On December 22, 2009, Shechem and NJUN One, L.L.C. entered into a contract that granted Shechem rights to install NJUN Systems throughout the State of Georgia for a fee of $600,000. The payment of this fee actually began in September 2009. Shechem never met with the Debtor or talked directly with him. Rather, Mr. Ringo represented to Shechem that he spoke for the Debtor. Shechem's owners were part of a faith-based group with Mr. Ringo. The Debtor was not of that faith or part of that group, and Mr. Ringo believed and understood that the other members of this faith-based group would not do business with the NJUN Companies unless he had control of the companies.

In the meantime, the loans from the outside investors had not been repaid. As a result, NJUN, L.L.C. began entering into forbearance agreements and repayment arrangements with the outside investors in late 2009. As no other existing member of NJUN, L.L.C. appeared to be in a position to contribute additional funds, the Debtor and Mr. Ringo moved towards Mr. Ringo asserting full control over the Debtor's interest in NJUN, L.L.C. Mr. Ringo had a substantial investment in the NJUN Companies already (at least $500,000), which he desired to protect. At the same time, his civil engineering business had drastically declined due to the recession, and he saw the opportunities between Shechem and the NJUN Companies as a potential source of work for his civil engineering firm and of income for himself (and others).

Both Mr. Ringo and the Debtor testified that "control" of NJUN Holding and therefor NJUN, L.L.C. was transferred in late 2009 or early 2010 and they believed the membership interest

in NJUN-NJUN was transferred at the same time, although the documentation of the transfer did not occur until October 2010.  A document entitled "Appointment of Managing Member" of NJUN Holding, L.L.C. is dated as of July 1, 2009 and appoints NJUN-NJUN as managing member of NJUN Holding, replacing the Debtor as managing member.  Notwithstanding this shift in "control" of NJUN Holding, and consequently NJUN L.L.C., the Debtor, with Larry Bradford, remained in control of the technical aspects of the NJUN Systems, including the design and modification of the product.  Additionally, Larry Bradford remained heavily involved in the accounting and bookkeeping of NJUN, L.L.C. in 2009.  Mr. Ringo took over the bookkeeping of NJUN, L.L.C. beginning January 1, 2010, and the only accounting records of NJUN, L.L.C. in 2010 are the QuickBooks that Mr. Ringo and his company maintained.  No sales of the NJUN System occurred in 2009.

In the spring of 2010, several events occurred.  As of April 27, 2010, a second amendment to the operating agreement for NJUN Holding, L.L.C. was executed, which delegated to Mr. Ringo a "specified territory" consisting of Florida, Alabama, Tennessee, South Carolina, North Carolina, and Virginia.  Mr. Ringo was given the same rights and powers within those six states as NJUN Holding, L.L.C. held.  Mr. Ringo was to form a new company with which to govern and manage the territory.  The agreement provided that, although the new company was autonomous, it was not "independent" of NJUN Holding, L.L.C. and was to be in a "mutual working relationship" with NJUN Holding in order to advance the interests of NJUN Holding.  Apparently in pursuit of this delegation of authority in specified territories, Mr. Ringo set up NJUN Southeast, L.L.C.

By the spring of 2010, Shechem had made its last payment under the agreement with NJUN One (for the State of Georgia).  However, the NJUN System was not yet ready for market.  The NJUN System needed additional development, and regulatory approval still needed to be obtained.

Further negotiations then ensued between Mr. Ringo, Shechem, and NJUN Southeast.  On June 3, 2010, Shechem executed an agreement with NJUN Southeast and Mr. Ringo that provided Shechem with the right to supply products associated with the NJUN System throughout the six states which were assigned to Mr. Ringo in the second amendment to the operating agreement ("Six States Agreement").  Again, all negotiations occurred between Shechem and Mr. Ringo, and Shechem did not communicate with the Debtor.  In exchange for the right to supply products to these six states, Shechem was to pay NJUN Southeast a territory fee of $30 million.  The territory fee would be paid in part in monthly installments.  For the first year, the payments were at least $50,000 per month and thereafter the payments were based on monthly sales.

Also in April 2010, the NJUN-NJUN, L.L.C. operating agreement was restated and provided, "The overall management and control of the business and affairs of the Company [NJUN-NJUN] shall be vested with the Managing Member Kevin Van Cleave Ringo ... .  All decisions with respect to the management of the Company that are made with the Managing Member in accordance with terms of this Agreement shall be binding on the Company and each of the percentage interest holders."  Since NJUN-NJUN was the managing member of NJUN Holding, Mr. Ringo effectively became the manager of NJUN Holding at the same time.  The NJUN-NJUN operating agreement provided Mr. Ringo was the company's secretary and registered agent.

The April 2010 agreement defined "Member" to mean the person or entity owning a percentage interest in the company as listed on Exhibit A attached to the agreement.  Debtor was the sole person identified in Exhibit A as a member; he held a 100% interest in NJUN-NJUN. Section 13.2 of the April 2010 agreement provides:

> In the event a Member transfers all or any part of a Member's Percentage Interest in compliance with the provisions of this Article XIII, the transferee of such

> Member's Percentage Interest shall not have the right to become a substituted Member of the Company unless the transferring Member has given such transferee such right and unless: . . . B. Such transferee accepts and agrees in writing to be bound by all of the terms and provisions of this Agreement;

Article XIV of the April 2010 agreement also provides all notices must be in writing ("Any notice, request, consent or communication . . . under this Agreement shall be effective only if it is in writing ... ."). As of June 1, 2010, the Debtor appointed Mr. Ringo the named managing member of NJUN Holding.

On October 22, 2010, Mr. Ringo and the Debtor executed an amendment to the NJUN-NJUN operating agreement that provided for the transfer of the Debtor's remaining interest in NJUN-NJUN to Mr. Ringo. Mr. Ringo did not pay any money to the Debtor in exchange for the transfer. The October 2010 amendment provides:

> the undersigned hereby consent to, authorize, approve and ratify the transfers of the percentage interests in the Company among its current Members in the amounts and manner set forth on "Exhibit A" . . . and any and all actions and filings taken by or at the direction of the Company in order to adopt and give full force and effect to such transfers[.]

The October 2010 amendment further provides in Exhibit A, "after White's resignation and transfer of his percentage interest to Ringo," Mr. Ringo would have 100% of the interest in NJUN-NJUN.

Debtor and Mr. Ringo testified that, in partial consideration for Debtor transferring his remaining interests in NJUN-NJUN to Mr. Ringo, Mr. Ringo promised, on behalf of NJUN, L.L.C., to pay the Debtor $10,000 a month. Mr. Ringo contends this consideration although paid by NJUN, L.L.C. was available solely by virtue of his efforts in obtaining the contracts with Shechem and the resulting flow of funds into the NJUN Companies. The Court finds that Debtor did receive $10,000 a month from the NJUN Companies throughout the year 2010. The Court also finds Mr. Ringo began receiving money from NJUN, L.L.C. in April 2010. The NJUN

Companies made no sales during 2010 and received no revenue or investments other than the proceeds from the contracts with Shechem.

In October 2010, discussions were ongoing between Mr. Ringo and representatives of Shechem regarding a potential sale of stock in NJUN Holding to Shechem. One proposal Mr. Ringo made was for Shechem to acquire a 5% stake in NJUN Holding for $3.5 million, equating to $700,000 per share. The draft term sheet regarding this purchase also contemplated modifications to the Six States Agreement. No such transaction was ever consummated, however; Shechem never purchased any interest in any of the NJUN entities; and the Six States Agreement was not modified. No sales of the NJUN System occurred through Shechem.

With the documentation of the various transactions complete, the NJUN Systems began to be installed at two locations in North Dakota in 2011. Mr. Ringo's relationship with Larry Bradford deteriorated and Mr. Ringo ceased making payments to Mr. Bradford. In April 2012, Robbie White (the Debtor's brother) sued the Debtor in Gwinnett County for failure to repay certain loans allegedly made to the Debtor for the business over numerous years. Robbie White contends he was a partner with the Debtor in the NJUN System, although there is no written partnership agreement. The Debtor borrowed money from Robbie White, and Robbie and his wife Phyllis White took out a mortgage on their home in order to provide funds for the development of the NJUN System. On July 30, 2003, Robbie White and the Debtor signed an agreement entitled "Acknowledgement of Debt Agreement" ("ADA"). In the ADA, the Debtor acknowledged he borrowed $150,000 from Robbie White in September 2001 and owed $20,000 in interest. The parties agreed that the loan from Robbie White to the Debtor was due and payable on or before January 2004. Although the evidence at the trial of this matter showed that some of the loan had been repaid, Robbie White obtained a default judgment against the Debtor on June 14, 2012 in the

amount of $162,074.72 consisting of $142,074.72 of the original $150,000, plus interest. Thereafter, Robbie garnished the Debtor's bank account, prompting the Debtor to file his bankruptcy petition.

## II.    APPLICABLE LAW

In the Complaint, Plaintiff states claims for actual and constructive fraud under O.C.G.A. §§ 18-2-74(a)(1), (a)(2)(B), 18-2-75, and 11 U.S.C. § 544.

### a.  Constructive Fraud

Count 2 of the Complaint seeks a finding the transfer of Debtor's interest in NJUN-NJUN (the "Transfer") constitutes a constructively fraudulent transfer under O.C.G.A. § 18-2-74(a)(2), which is available to the trustee under the avoidance power in 11 U.S.C. § 544.  Section 544 permits a trustee to avoid a transfer of property of the debtor that is voidable by a hypothetical creditor that extends credit to the debtor at the commencement of the case and obtains at that time either a judicial lien or an execution that is returned unsatisfied.  11 U.S.C. §§ 544(a)(1), (2). Additionally, "the trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 ... ."  11 U.S.C. § 544(b)(1).  The Court finds Robbie White holds a claim that predates the Transfer as set out in the findings of fact, above.

A transfer is avoidable as a constructive fraudulent conveyance where the debtor received less than a reasonably equivalent value in exchange for the transfer and the debtor intended to incur, or reasonably believed he or she would incur, debts beyond his or her ability to pay as they became due.  O.C.G.A. § 18-2-74; see Renasant Bank, Inc. v. Smithgall, 1:15-cv-0459-SCJ, 2016 WL 4502374, at *2 (N.D. Ga. June 13, 2016).  To find a transfer avoidable under this section, the court must determine whether the value received is reasonably equivalent to the value transferred,

which will depend on the facts of each case." Kipperman v. Onex Corp., 411 B.R. 805, 828-29, 837 (N.D. Ga. 2009) (discussing the standard for constructive fraud under 11 U.S.C. § 548 and O.C.G.A. §§ 18-2-74(a)(2) and 18-2-75). The relevant date for determining whether reasonably equivalent value was received is the date of the transaction. *See* In re Joy Recovery Tech. Corp., 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002)). The statute of limitations for bringing a claim under the UFTA is four years from the date of the transfer. O.C.G.A. § 18-2-79.

The Plaintiff characterizes the Transfer in general terms as a transfer of the Debtor's interest in "NJUN." To be precise, the transfer was of Debtor's interest in NJUN-NJUN, L.L.C. In 2009, that interest was 100%. NJUN-NJUN held 55.9% of NJUN Holding, which held 51% of NJUN L.L.C. Effectively then, Debtor held 55.9% of a 51% interest in NJUN L.L.C., which equates to 28% of NJUN L.L.C. Plaintiff describes this interest as a majority interest but it is not. It was the largest interest held in NJUN L.L.C. by a single member, but it was not a majority interest. It is also important to note that in April 2010, more than four years before Debtor filed the bankruptcy petition, the NJUN-NJUN operating agreement was amended to provide Mr. Ringo virtually unfettered management control of NJUN-NJUN as a manager and "managing member," further limiting the effectiveness of Debtor's interest.

Transfers of a debtor's ownership interest in a limited liability company (an "L.L.C.") can qualify as an avoidable transfer. *See* Campbell v. Hanckel (In re Hanckel), 512 B.R. 539, 548 (Bankr. D.S.C. 2014) (involved an allegedly fraudulent transfer of the debtor's membership interest in a limited liability company prior to filing bankruptcy). The parties do not dispute the Transfer of Debtor's interest in NJUN-NJUN constituted a transfer. However, the date of the Transfer and the value of the interest transferred remain in dispute.

### i. Timing of the Transfer

The amendment to the NJUN-NJUN operating agreement is dated October 22, 2010, but the precise date of the Transfer is contested by the parties. Debtor and Mr. Ringo contend Debtor conveyed his interest in the NJUN Companies to Mr. Ringo in 2009 or early 2010; they state Plaintiff's reliance on the October 2010 amendment to the operating agreement is misplaced as the amendment only clarified the transfer that occurred months earlier. Plaintiff contends Debtor did not transfer his interest in the NJUN entities until October 2010. If the Transfer occurred before August 2010 (four years before the bankruptcy petition was filed), the Transfer is outside the statute of limitations and unavoidable.

In Georgia, L.L.C.s are governed by the Georgia Limited Liability Company Act (the "Act"). "Limited liability company interest," as defined in section 14- 11-101(13), is a technical term and it is not strictly analogous to corporate "share." Although "limited liability company interest" is sometimes thought to include the full panoply of rights a member may have in a L.L.C., the term as defined by the Act has a more limited meaning. "Limited liability company interest" refers *only* to the economic interest the member may have as an equity holder— to the member's share of profits and losses and the member's right to receive distributions. O.C.G.A. § 14-11-101(13). The rights of a member may, and typically do, encompass more than such economic interest, including rights to governance or management or simply the receipt of information. These other rights are not inherently tied to the holding of a "limited liability company interest" in the somewhat narrow sense defined by the statute, and a L.L.C. can designate some other stakeholder—such as an employee, creditor or former equity-owner— as a "member," even though the stakeholder does not have a "limited liability company interest." *See* L. Andrew Immerman & Lee Lyman, *The Georgia LLC Act Comes of Age,* GEORGIA BAR JOURNAL, *available at*

https://www.alston.com/-/media/files/insights/publications/2010/08/the-georgia-llc-act-comes-of-age-igeorgia-bar-jour/files/immerman_georgia-bar-journal-810-llc-article/fileattachment/immerman_georgia-bar-journal-810-llc-article.pdf.   The Uniform Limited Liability Company Act similarly provides a member's rights in a L.L.C. are bifurcated into economic rights and governance rights.  *See also* <u>SE Prop. Holdings, LLC v. McElheney</u>, No. 5:12CV164-MW/EMT, 2016 WL 7494300, at *5 (N.D. Fla. May 7, 2016) (explaining a membership interest in a L.L.C. consists of governance and economic rights, which are two separate property rights).

The Act provides a limited liability company interest is assignable in whole or in part. O.C.G.A. § 14-11-502.  An assignment entitles the assignee to share in the profits and losses and to receive the distributions to which the assignor was entitled, to the extent assigned. <u>Id.</u>  The Act further provides an assignee of a limited liability company interest may become a member only if the other members unanimously consent.  O.C.G.A. § 14-11-503; *see also* <u>Hopson v. Bank of N. Ga.</u>, 258 Ga. App. 360, 362-63, 574 S.E.2d 411, 413 (2002) (discussing these provisions).  Where there are no other members in a L.L.C., however, written unanimous approval of a transfer may not be necessary.  *See* <u>In re Albright</u>, 291 B.R. 538, 540 (Bankr. D. Colo. 2003); *see also* <u>Still v. Bowers (In re McKenzie)</u>, Nos. 08-16378, 12-1081, 2014 Bankr. LEXIS 701, at *22 (Bankr. E.D. Tenn. Feb. 21, 2014) (finding, because the alleged transfer of the membership interest was between the debtor and an entity he owned or controlled, and because they were the sole members of the L.L.C., it could be inferred the members waived the requirement of written consent).

Acquiring economic rights in a L.L.C. does not, in and of itself, equate to "ownership" or "membership" in the L.L.C.  <u>Spurlock v. Begley</u>, 308 S.W.3d 657 (Ky. 2010).  In <u>Spurlock</u>, the court explained a L.L.C. member may assign his interest to another and such assignment permits

14

the assignee to receive the distributions to which the assignor would be entitled. An assignment does not dissolve the L.L.C. or entitle the assignee to participate in the management of the L.L.C., and the assignor remains a member of the L.L.C. unless and until the assignee is admitted to membership. Although the formal admission of any new member to a L.L.C. generally must be made in writing, a mere assignment of a L.L.C. interest does not need to be in writing. The court rejected the argument that the only method to have ownership in a limited liability company is to be admitted as a member. Indeed, a non-member can still make some decisions and enjoy the exclusive rights of possession, enjoyment, and disposal. *See* Brandt v. Tabet, Vito & Rothstein, LLC (In re Longview Aluminum, LLC), 419 B.R. 351 (Bankr. N.D. Ill. 2009) (explaining a non-member manager is the legal equivalent of a corporate director for a corporation).

With this background, the Court must analyze the date of the Transfer to determine if Plaintiff's claim is barred by the statute of limitations. It is evident that there was no written approval of a transfer of the Debtor's interest to Mr. Ringo until October 2010. But, the April 2010 operating agreement for NJUN-NJUN, L.L.C. vested the overall management and control of NJUN-NJUN's business with Mr. Ringo and named Mr. Ringo as NJUN-NJUN's "Managing Member." The agreement provided, "The overall management and control of the business and affairs of the Company [NJUN-NJUN] shall be vested with the Managing Member Kevin Van Cleave Ringo ... . All decisions with respect to the management of the Company that are made with the Managing Member in accordance with terms of this Agreement shall be binding on the Company and each of the percentage interest holders." Since NJUN-NJUN was the managing member of NJUN Holding, Mr. Ringo effectively became the manager of NJUN Holding at the same time. The agreement also provided Mr. Ringo was the company's secretary and registered agent

15

The agreement defined "Member" to mean the person or entity owning a percentage interest in the company as listed on Exhibit A attached to the agreement. Debtor was the sole person identified in Exhibit A as a member; he had a 100% interest in NJUN-NJUN. The April 2010 operating agreement further provided a transfer of any part of a member's percentage interest had to be in writing. Section 13.2(B) specified a transferee had to "accept and agree in writing to be bound by all the terms and provisions of this Agreement[.]" The April 2010 agreement provided that Mr. Ringo had management rights in NJUN-NJUN but he did not then "own" any interest in the company. This does not resolve the matter, though, as the Debtor may have assigned his economic interest to Mr. Ringo. Such an assignment did not need to be in writing, so a lack of a writing is not dispositive.

On October 22, 2010, Mr. Ringo and Debtor executed an amendment to the NJUN-NJUN operating agreement. The agreement provides:

> the undersigned hereby consent to, authorize, approve and ratify the transfers of the percentage interests in the Company among its current Members in the amounts and manner set forth on "Exhibit A" . . . and any and all actions and filings taken by or at the direction of the Company in order to adopt and give full force and effect to such transfers[.]

The agreement further provides in Exhibit A that, "after [Debtor]'s resignation and transfer of his percentage interest to [Mr.] Ringo," Mr. Ringo would have a 100% interest in NJUN-NJUN. The October agreement entitled Mr. Ringo (who, according to Debtor and Mr. Ringo's testimony, had already been assigned Debtor's economic interest in the L.L.C. and managed the company) to officially become a member of the L.L.C., at which point Debtor ceased to be a member of NJUN-NJUN.

While Debtor did not document a transfer of his interest to Mr. Ringo until October 2010, it is possible – even likely – that Debtor not only gave Mr. Ringo managerial rights but also

assigned Mr. Ringo his economic interest in NJUN-NJUN months earlier.  A limited liability company interest is assignable and such an assignment does not need to be in writing.  An assignment of Debtor's interest in NJUN-NJUN would not have entitled Mr. Ringo to become a member of the L.L.C., but it would have resulted in a transfer of the Debtor's economic interest in the L.L.C. to Mr. Ringo.  The testimony indicates Debtor believed he gave Mr. Ringo his full interest, including his economic interest in the L.L.C., before August 2010.  The evidence shows Mr. Ringo began receiving money from NJUN L.L.C. in April 2010, which is consistent with the April 2010 transactions.

Debtor testified that Mr. Ringo took over NJUN-NJUN in 2009 and that Mr. Ringo could "do anything he wanted to do" with his shares in early 2010.  He repeatedly stated that "everything was all [Mr.] Ringo's" and that Mr. Ringo had "everything" by April 2010.  Debtor's testimony shows he thought he had, and intended to, transfer managerial rights and assign Mr. Ringo his economic rights in NJUN-NJUN well before the October agreement was executed.

Mr. Ringo similarly testified that Debtor had told him that he could have the Debtor's full interest in NJUN-NJUN in early 2010.  Debtor reportedly told him he could "have it all."  Mr. Ringo said that he wanted control and that he obtained control of Debtor's interest in NJUN-NJUN in April 2010.  He stated that he had wanted control of the company so that he could pursue potential business deals with autonomy.

The evidence shows Mr. Ringo asserted operational control over sales in Georgia in 2009 and asserted financial control over the NJUN Companies beginning January 1, 2010, when the only bank records of expenditures of the NJUN Companies are the QuickBooks which he and his company maintained.  Debtor and Mr. Ringo both testified that Debtor gave his full interest in NJUN-NJUN to Mr. Ringo in early 2010 and that the October 2010 agreement merely formalized

the arrangement.  The Court had the opportunity to observe both Debtor's and Mr. Ringo's demeanor as they testified and finds their testimony credible.

The burden of proving what was transferred and when lies with the Plaintiff.  *See* Howell v. Noble (In re Noble), No. 07-1060-WHD, AP No. 07-1060, 2008 Bankr. LEXIS 1987, *17 (Bankr. N.D. Ga. May 5, 2008); *see also* Kapila v. WLN Family Ltd. P'ship (In re LeNeve), 341 B.R. 53, 58 (Bankr. S.D. Fla. 2006).  Considering the evidence and testimony presented, the Court finds that it is as likely that Debtor transferred his management and economic interest in NJUN-NJUN to Mr. Ringo before October 2010 as it is that he transferred it in October 2010.  While Mr. Ringo may not have been identified as a "member" in NJUN-NJUN until October 2010, the evidence shows that he managed the company and may have received Debtor's economic rights in NJUN-NJUN many months earlier.  Based on that testimony and evidence presented, Plaintiff has failed to convince the Court that, more likely than not, the transfer of Debtor's management and economic rights occurred after August 2010.

### ii.  The Value of the Interest Transferred

Even if the date of the Transfer of all Debtor's rights was October 2010, the parties dispute whether Debtor received reasonably equivalent value for the Transfer.

Whether a debtor received reasonably equivalent value in exchange for a transfer is a factual determination that requires consideration of the totality of the circumstances.  *See* Kipperman v. Onex Corp., 411 B.R. 805, 828-29, 837 (N.D. Ga. 2009) (discussing the standard for constructive fraud under 11 U.S.C. § 548 and O.C.G.A. §§ 18-2-74(a)(2) and 18-2-75); *see also* In re Chase & Sanborn Corp., 904 F.2d 588,593 (11th Cir. 1990) ("It has long been established that whether fair consideration has been given for a transfer is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.").   Totality of the

circumstances includes consideration of the good faith of the parties, the difference between the amount paid and the fair market value of what is received, the existence of an arm's length transaction, and any indirect benefits.  Watts v. Peachtree Tech. Partners, LLC (In re Palisades at W. Paces Imaging Ctr., L.L.C.), Nos. 09-87600-WLH, 11-5183, 2011 Bankr. LEXIS 3576, at *23-24 (Bankr. N.D. Ga. Sep. 13, 2011).

Value can be "reasonably equivalent" without involving a dollar-for-dollar exchange. Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.), 490 F.3d 1325, 1336 (11th Cir. 2007).   Rather, the Court need only ensure that "the debtor received a fair exchange," after examining "all aspects of the transaction and carefully [measuring] the value of all benefits and burdens to the debtor."  In re Mann v. Brown (In re Knight), 473 B.R. 847, 851 (Bankr. N.D. Ga. 2012) (citing In re Richards and Conover Steel, Co., 267 B.R. at 612)).

The relevant date for determining whether reasonably equivalent value was received is the date of the transaction, In re Joy Recovery Tech. Corp., 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002), and the plaintiff bears the burden of proving a transfer was made for less than reasonably equivalent value.  In re Kimmell, 480 B.R. 876, 889 (Bankr. N. D. Ill. 2012); *see also* In re Joy Recovery Tech. Corp., 286 B.R. at 73 (stating the complainant has the burden of proving that the transfer in question was made for less than reasonably equivalent value).

In some cases, the governing operating agreement may fix a method or formula for determining the value of a L.L.C. interest.  For example, in Kyle v. Apollomax, LLC., 987 F. Supp. 2d 519, 528 (D. Del. 2013), the operating agreement expressly covered valuation of a removed member's interest.  Where the operating agreement is silent as to the value a resigning member is entitled to receive for his limited liability company interest, courts employ a variety of tests to determine value.  The value of a withdrawing member's interest may be determined by looking to

book value, market value of the underlying company assets, fair market value of the member's interest, or other means, depending on the circumstances requiring the valuation. Fancher v. Prudhome, 112 So. 3d 909, 912 (La. App. 2013); *see also* Denike v. Cupo, 926 A.2d 869, 884 (N.J. App. 2007), *cert. granted*, 192 N.J. 598, 934 A.2d 640 (2007), *rev'd on other grounds*, 196 N.J. 502, 958 A.2d 446 (2008) (construing New Jersey Limited Liability Company Act and explaining, while there is no inflexible test to determine the fair value of a resigning member's interest in a L.L.C., courts generally consider proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court).

Valuation issues can be complex and courts often look to expert testimony to help quantify value. For example, in Denike, 926 A.2d 869, the plaintiff sought to buy out defendant's 50% interest in the company. After the parties could not agree on a buyout amount, litigation ensued. The court noted the valuation of the business was difficult to determine under the conventional methods used to value small businesses. The court relied on expert testimony to explain the worth of the business. On appeal, the plaintiff challenged the trial court's determination of the fair value of his interest. The appellate court found the valuation expert correctly noted the interest being sold was not listed on any stock market and, thus, was not readily marketable. Further, the traditional "fair market value," which assumes a willing buyer and willing seller, did not apply because defendant's interest had little value to outsiders but significant intrinsic value to plaintiff who wanted to continue the business. The appellate court also noted the trial court had discretion to round-off the final valuation figure because valuation is not an exact science. *See also* Peltz v. Hatten, 279 B.R. 710, 728–34 (D. Del. 2002) (describing experts' valuation methods and calculation of variables in fraudulent conveyance action); Stan Bernstein, Susan H. Seabury, & Jack F. Williams, *The Empowerment of Bankruptcy Courts in Addressing Financial Expert*

*Testimony*, 80 AM. BANKR. L.J. 377, 408 (2006) (discussing standard methods of valuation and the use of financial expert testimony in bankruptcy cases).

When valuing a start-up, or "pre-revenue," company, there are a few additional factors for courts to consider.  First, it is the execution of the ideas – not the ideas themselves – that hold value.  Second, personnel are also key, as it is up to a team to bring promising technology to fruition.  Finally, because some investments are riskier than others, an appropriate discount rate should reflect the risk involved.  *See* Hon. Christopher S. Sontchi, *Valuation Methods: A Judge's View*, 20 AM. BANKR. INST. L. REV. 1 (2012).

It is undisputed Mr. Ringo did not pay Debtor for his shares in NJUN-NJUN.  Mr. Ringo claims the consideration for the transfer of Debtor's interest in NJUN-NJUN was that he, Mr. Ringo, would run the day to day operation of the business.  However, assuming the date of the Transfer was October 2010, the evidence shows Mr. Ringo was already running the business and was already a managing member of NJUN-NJUN; he did not give anything new in exchange for Debtor's economic ownership interest in NJUN-NJUN.  There is no evidence Debtor and Mr. Ringo's duties and responsibilities changed in any way at the time of the Transfer if it occurred in October 2010.  Thus, Mr. Ringo's continued management of the NJUN entities cannot be consideration for the transfer of the Debtor's interest in NJUN-NJUN.

Debtor and Mr. Ringo testified that, in partial consideration for Debtor transferring his remaining interests in NJUN-NJUN to Mr. Ringo, Mr. Ringo promised, on behalf of NJUN, L.L.C., to pay the Debtor $10,000 a month.  Mr. Ringo contends this consideration although paid by NJUN, L.L.C. was available solely by virtue of his efforts in obtaining the contracts with Shechem and the resulting flow of funds into the NJUN Companies.  Debtor did receive $10,000

a month from the NJUN Companies throughout the year 2010, and Mr. Ringo began receiving money from NJUN, L.L.C. in April 2010.

The Court need not decide whether this monthly payment to the Debtor constitutes reasonably equivalent value because there remains the issue of whether Debtor's NJUN-NJUN interest had any value. Plaintiff contends it had some value, perhaps up to $15 million. Plaintiff contends, however, the Court need not fix a value since he is not seeking a monetary judgment. He argues that the interest had "some" value and "no" value was paid.

Plaintiff points to the evidence showing, around the time of the Transfer, discussions were ongoing between Mr. Ringo and representatives of Shechem regarding a potential sale of stock in NJUN Holding to Shechem. Per a draft term sheet, Mr. Ringo asked Shechem to acquire a 5% stake in NJUN Holding for $3.5 million, equaling $700,000/share. While the transaction was not consummated, Plaintiff contends the proposal shows NJUN had prospects at the time of the Transfer. But, the unconsummated transaction is not sufficient to establish Debtor's interest in NJUN-NJUN had value. Moreover, Plaintiff presented no balance sheets, no income statements, and no financial documents to help the Court place a value on the company. Plaintiff did not explain how the membership interest in NJUN-NJUN could have value given the lack of sales and the amount of debt of NJUN, L.L.C. Further, Plaintiff failed to introduce expert testimony as to NJUN-NJUN's value or any evidence of the projected future value of the company or sales of interests in comparable businesses.

Mr. Ringo argues Debtor's interest in NJUN-NJUN had little to no value because the company was carrying a large debt burden and had no contracts to manufacture and install the NJUN System. Debtor and Mr. Ringo testified the NJUN Companies were in distress – the NJUN Companies did not have a finished product to sell, did not have state approval to install the product,

had not installed the product, had not generated any sales, did not have any contracts, and were indebted to creditors at the time of the Transfer. Debtor stated he did not think "a man on the planet" would buy his NJUN-NJUN interest and, at the time of the Transfer, his interest was worthless. He explained he had tried, repeatedly and unsuccessfully, to get money for his interest. While the Debtor admitted the system was under development and had some potential, he stated no one was willing to pay for his interest in NJUN-NJUN.

Mr. Ringo similarly testified the NJUN-NJUN interest "wasn't really worth anything." He also noted Debtor had already tried to solicit investors, but no one had wanted to pay for the NJUN-NJUN interest. Mr. Ringo observed that, while the NJUN system was based on promising technology, the NJUN entities had been developing the system for years and had yet to install it anywhere.

Having weighed and considered the evidence presented by the parties, the Court concludes Plaintiff has failed to show by a preponderance of the evidence that the Debtor's interest in NJUN-NJUN had value. In considering the totality of the circumstances, the Court notes the interest transferred was not listed on any stock market and was not readily marketable. NJUN-NJUN, and even NJUN L.L.C., were closely held companies. Mr. Ringo already exercised managerial control over NJUN-NJUN. Realistically, no one would want the Debtor's interest with all the restrictions included. Even were it marketable, the economy was in a considerable state of upheaval in 2009 – 2010. Further, the traditional "fair market value," which assumes a willing buyer and willing seller, did not apply because Debtor's interest had little value to outsiders; indeed, he unsuccessfully tried to sell it to others before ultimately transferring it to Mr. Ringo. That the NJUN technology had potential does not mean the NJUN-NJUN membership interest had value. While Plaintiff relies on evidence regarding a potential sale of stock in NJUN Holding to Shechem,

the terms of the draft term sheet were never consummated, and a single product had yet to be installed at the time of the Transfer.

Based on the testimony and the limited evidence of value at the time of the Transfer presented by Plaintiff, the Court finds Plaintiff has not shown by a preponderance of the evidence that the Debtor's interest in NJUN-NJUN transferred had any value.  In short, Plaintiff has not sustained his burden of proof that the price paid by Mr. Ringo for the Debtor's NJUN-NJUN interest did not represent reasonably equivalent value at the time of the transfer.  Therefore, as reasonably equivalent value is an essential element of a constructive fraud claim under both the Bankruptcy Code and the Georgia Code, the Court will enter judgment in favor of Mr. Ringo on Count II of the Complaint.

### b. Constructive Fraud Under O.C.G.A. § 18-2-75

In Count 3 of the Complaint, Plaintiff alleges the transfer from Debtor to Mr. Ringo of Debtor's NJUN-NJUN interest is avoidable under O.C.G.A. § 18-2-75.  Section 18-2-75 provides a transfer will be voidable as to a creditor whose claim arose before the transfer where "the debtor made the transfer . . . without receiving reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer ... ." O.C.G.A. § 18-2-75(a).

Though Plaintiff argues Debtor made the Transfer without receiving reasonably equivalent value, the Court has already determined that Plaintiff did not carry his burden on that point.  As this is a necessary element of O.C.G.A. § 18-2-75, the Court finds Plaintiff has failed to demonstrate the Transfer is avoidable under O.C.G.A. § 18-2-75 and will enter judgment in favor of Mr. Ringo on Count III of the Complaint.

### c. Actual Fraud

Count 1 of the Complaint seeks a finding of actual fraud under O.C.G.A. § 18-2-74(a)(1).

Section 18-2-74(a)(1) prohibits transfers made "[w]ith actual intent to hinder, delay, or defraud

any creditor of the debtor ... ."  O.C.G.A. § 18-2-74(a)(1).  To determine whether a debtor acted

with actual intent, "consideration is given to an open-ended set of factors listed in O.C.G.A. § 18-

2-74(b), which are commonly called the 'badges of fraud.'"  Bloom v. Camp, 785 S.E.2d 573, 578

(2016) (citing RES-GA Hightower, LLC v. Golshani, 778 S.E.2d 805, 807 (2015)).  The badges

of fraud include:

> (1) The transfer or obligation was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer was disclosed or concealed;
> (4) Before the transfer was made the debtor had been sued or threatened with suit;
> (5) The transfer was of substantially all the debtor's assets;
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made;
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-72(b)(1)-(12).  The list is meant to be "a nonexclusive catalogue of factors

appropriate for consideration by the court in determining whether the debtor had actual intent to

hinder, delay, or defraud one or more creditors."  Unif. Fraudulent Transfer Act § 4 cmt. 5, 7A

ULA 654 (2004).  Courts consider the totality of the circumstances, using the factors as "relevant

evidence as to the debtor's actual intent from which the finder of fact may draw an inference of

actual intent to defraud."  Bishop v. Patton, 706 S.E.2d 634, 641 (2011) (citation omitted).

Mr. Ringo argues Plaintiff failed to produce evidence showing actual intent to hinder, delay, or defraud. Mr. Ringo contends the only badge of fraud implicated is that Mr. Ringo could potentially be considered an insider. Plaintiff contends several badges of fraud apply, including: the transfer was to an insider; Debtor remained in control of NJUN; the transfer was concealed from Robbie White; the transfer consisted of substantially all of Debtor's assets and left him insolvent; and Debtor did not receive reasonably equivalent value for the transfer.

The Court finds limited evidence of fraud. Mr. Ringo was an insider. However, there was considerable evidence presented at trial that mitigates against a finding of fraud. Both Debtor and Mr. Ringo testified they believed the Transfer was a necessary and good business decision in light of the company's financial condition. These facts intimate that, despite Mr. Ringo being an insider, this was not a scheme to transfer value out of the reach of Debtor's creditors; on the contrary, it was the outcome of an attempt to salvage a failing enterprise. Further, the testimony and evidence presented at trial demonstrate Debtor did not remain in control of NJUN – while he may have continued to be involved in certain ways, Mr. Ringo unquestionably controlled NJUN's financial records, handled negotiations on behalf of the company, and was involved in the day-to-day operations of the company. Additionally, though Plaintiff argues that the transfer was also tainted by a lack of equivalent value, the Court has already determined Plaintiff did not carry his burden on that point.

The Court is not convinced that, more likely than not, the Debtor acted fraudulently. Thus, Plaintiff has failed to carry his burden on Count I of the Complaint, and the Court will enter judgment for Mr. Ringo.

### III.    CONCLUSION

For the reasons stated above, the Court finds Plaintiff has failed to carry his burden on Counts I, II, III of the Complaint.  Accordingly,

**IT IS ORDERED** that Counts I, II, III of the Complaint are **DENIED**.  Judgment will be entered in favor of Mr. Ringo by separate order.

The Clerk's Office is directed to serve a copy of this order on Plaintiff, Plaintiff's counsel, Defendant, and Debtor.

### END OF DOCUMENT